UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAWN EUGENE WIMBERLY,
                 PETITIONER,

vs.                                      CIVIL NO: 05-40069
                                      CRIM NO: 93-CR-50028-4

                                      DISTRICT JUDGE ROBERT CLELAND
UNITED STATES OF AMERICA,        MAGISTRATE JUDGE STEVEN D. PEPE
                 RESPONDENT.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Petitioner Shawn Eugene Wimberly's "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody," filed on February 28, 2005 (Dkt. #593).  Respondent, the United States of America, filed a "Response to Motion to Vacate Sentence," on May 9, 2005 (Dkt. #603).

Petitioner alleges four grounds on which his sentence should be vacated: (1) that his pre-sentence investigation report contained inaccurate information; (2) that his sentence was improperly enhanced for an alleged leadership role; (3) that his "relevant conduct" from 1987-1993 was inaccurate; and (4) ineffective assistance of counsel.  For the reasons stated below, **IT IS RECOMMENDED** that Petitioner's Motion **BE DENIED.**

## I.       BACKGROUND

### A.       Factual Background – the Rule 11 Plea Agreement & Plea Hearing

Petitioner stipulated to the following facts in his Rule 11 Plea Agreement (Dkt. #601, pp. 4-6).

1.      Count Two.  During the time frame of 1987 until May 1993, Shawn Eugene Wimberly conspired and agreed with Olee Wonzo Robinson and other persons based in Detroit, Michigan; Flint, Michigan; Los Angeles, California; and elsewhere to assist one another in the distribution of over 15 kilograms of powder cocaine. During this time frame, Shawn Eugene Wimberly made trips to Los Angeles, California, to acquire kilograms of cocaine from sources he developed in that city for Olee Robinson and others, returning with the cocaine to Michigan.

2.      Count Twelve. On February 17, 1993, Shawn Eugene Wimberly was driving a vehicle in which he knowingly possessed approximately one kilogram of powder cocaine.  He was stopped by a marked Westland Police patrol vehicle for a traffic violation. After learning a warrant was out for Mr. Wimberly's arrest, the police officer approached Mr. Wimberly's vehicle and told Mr. Wimberly to exit the vehicle.  Mr. Wimberly sped away.  The police officer chased Mr. Wimberly in his patrol vehicle.  During the chase, Mr. Wimberly threw the kilogram of cocaine out of the window of his motor vehicle.  Mr. Wimberly evaded the police officer through aggressive driving, abandoned his vehicle, and evaded arrest until September 2002.  The cocaine in the vehicle was intended to be sold to other persons.

3.      Count Thirteen.  During March 1-2, 1993, Shawn Eugene Wimberly accompanied Edward Osborne in an airplane from Detroit-Metro Airport in Romulus, Michigan to Los Angeles, California.  While in Los Angeles, Shawn Eugene Wimberly knowingly helped acquire approximately one kilogram of cocaine for a return shipment by airplane to Detroit-Metro Airport for subsequent sale (distribution) in the Detroit and Flint, Michigan areas.  The cocaine was successfully acquired by Shawn Wimberly in Los Angeles, transferred to the joint possession of Edward Osborne and him, and sent back to the Detroit area in the same airplane used by Wimberly and Osborne.  While at the Detroit-Metro Airport, Shawn Wimberly became suspicious that an undercover law enforcement officer was watching him near the baggage claim area.  Wimberly decided not to retrieve the cocaine, abandoned it, and left the airport.

That agreement noted the sentencing parameters for each count:

Count Two:  Conspiracy to Distribute Controlled Substances
21 U.S.C §§ 841(a)(1), 841(b)(1)(A), and 846
Statutory Minimum Incarceration Period:  10 years

2

Statutory Maximum Incarceration Period:  Life

Count Twelve: Possession with Intent to Distribute Cocaine
21 U.S.C. § 841(a)(1)
Statutory Minimum Incarceration Period:  5 years
Statutory Maximum Incarceration Period:  20 years

Count Thirteen:  Distribution of Cocaine/Aiding and Abetting
21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2
Statutory Minimum Incarceration Period:  5 years
Statutory Maximum Incarceration Period:  20 years

(Dkt. #601, 1-2.)

At his plea hearing, Judge Gadola had the Petitioner under oath acknowledge signing the

Rule 11 Agreement on April 25, 2003, after reading it "fully, thoroughly, and completely."

(Transcript of Plea held on 4/28/03,  Dkt. # 620, at p. 29).  He additionally acknowledged that

before signing he discussed "the contents of the agreement fully, thoroughly, and completely with

Mr. Richardson" his attorney who explained "the document to [him] fully, thoroughly, and

completely."  (*Ibid.*).  Petitioner had earlier noted that his schooling included completion of two

years of college.  (*Id.* at. 5).  Petitioner acknowledged that when he signed the Rule 11 Agreement

on April 25 and again on April 28 that he "fully, thoroughly, and completely understood all the

terms and provisions of this agreement."  (*Id.* at. 29-30).  Petitioner further acknowledged that

under Count 2 of the Third Superceding Indictment the government had to prove beyond a

reasonable doubt that he knowingly, intentionally and voluntarily conspired to distribute five or

more kilograms of cocaine."  (*Id.* at. 30-31).  Petitioner further acknowledged that under Count 12

of the Third Superceding Indictment the government had to prove beyond a reasonable doubt that

he knowingly, intentionally and voluntarily possessed with the specific intent to distribute

cocaine.  (*Id.* at. 31-32).  Petitioner further acknowledged that under Count 3 of the Third

Superceding Indictment the government had to prove beyond a reasonable doubt that he

3

knowingly, intentionally and voluntarily aided and abetted in the distribution of cocaine. (*Id.* at. 33-33).

Judge Gadola then had Petitioner under oath acknowledge that he agreed that the facts stated in I. A. 1. above related to Count 2 of the Third Superceding Indictment were true and accurate and that between 1987 and May 1993 he conspired with Olee Wonzo Robinson and other persons based in Detroit, Flint, Los Angeles, and elsewhere to assist one another in the distribution of over 15 kilograms of powder cocaine. (*Id.* at. 34). Petitioner under oath acknowledged further that during this time frame, he made trips to Los Angeles to acquire kilograms of cocaine from sources he developed in that city for Olee Robinson and others, returning with the cocaine to Michigan. (*Ibid.*).

Judge Gadola then had Petitioner under oath acknowledge that he agreed that the facts stated in I. A. 2. above related to Count 12 of the Third Superceding Indictment were true and accurate and that on February 17, 1993, he was driving a vehicle in which he knowingly possessed approximately one kilogram of powder cocaine. (*Ibid.*). Petitioner under oath acknowledged further that he was stopped by a marked Westland Police patrol vehicle for a traffic violation and after learning a warrant was out for his arrest, the police officer approached his vehicle and told him to exit the vehicle and he sped away. (*Id.* at. 34- 35). Petitioner under oath acknowledged further the police officer chased him and during the chase, Petitioner threw the kilogram of cocaine out of the window of his motor vehicle, which cocaine was intended to be sold to other persons. (*Id.* at. 35).

Judge Gadola then had Petitioner under oath acknowledge that he agreed that the facts stated in I. A. 3. above related to Count 13 of the Third Superceding Indictment were true and accurate and that during March 1-2, 1993, he accompanied Edward Osborne in an airplane from

4

Detroit-Metro Airport to Los Angeles where he knowingly helped acquire approximately one

kilogram of cocaine for a return shipment by airplane to Detroit-Metro Airport for subsequent

sale, that is distribution in the Detroit and Flint, Michigan areas.  (*Id.* at. 35-35).  Petitioner under

oath acknowledged further that the cocaine was successfully acquired by him in Los Angeles and

transferred to the joint possession of Edward Osborne and him, and sent back to the Detroit area

in the same airplane used by Petitioner and Osborne.  (*Id.* at. 36).  Petitioner under oath

acknowledged further that while at the Detroit-Metro Airport, Shawn Wimberly became

suspicious that an undercover law enforcement officer was watching him near the baggage claim

area and he therefore  decided not to retrieve the cocaine, and instead  abandoned it  and left the

airport.  (*Ibid*.).

Thus, Petitioner, on April 25 when he signed the Rule 11 Agreement and again on April

28 when under oath, acknowledged that his criminal actions to which he was pleading involved at

least 15 kilograms of cocaine.

Judge Gadola then had Petitioner under oath acknowledge that he agreed that under

paragraph 2A of the Rule 11 Agreement the Government had agreed that a sentence of not more

than the midpoint of the sentencing guideline range that the Court finds to be applicable to

Petitioner is an appropriate sentence and that he was facing a ten year statutory minimum

sentence.  (*Id.* at. 36-37 ).  Judge Gadola then had Petitioner under oath acknowledge that he

agreed that under paragraph 3A of the Rule 11 Agreement with the attached sentencing guideline

worksheets and the sentencing guideline provisions that applied to his sentencing.  (*Id.* at.38).

These attachments showed that the criminal offense involved "[a]t least 15 kilograms but less

than 50 kilograms  of cocaine" and that Petitioner played a "[m]anagement role (locating and

dealing with out-of-state cocaine suppliers." (Dkt.# 601, Rule 11 Plea Agreement Worksheet A, p. 1).

Judge Gadola reviewed the fact that Petitioner agreed to cooperate with the Government and the Government would make a motion for and recommend downward departure which the Court could reject and that would not be grounds for Petitioner to withdraw his guilty plea or rescind the plea agreement. (Transcript of Plea held on 4/28/03, Dkt. # 620, at p. 44-45). Judge Gadola had Petitioner under oath acknowledge that he understood that under paragraph 7 of the plea agreement that if a sentence was imposed equal to or less than the maximum described in Paragraph 2A of the agreement (which was the mid-point of the sentencing guideline range the Court found applicable, which on the attached worksheet had an offense level of 37 and a sentencing range of 151-188 months (Dkt.# 601, Rule 11 Plea Agreement Worksheet D)), then Petitioner was waiving any right to appeal his conviction or his sentence including any appeal on the grounds that the sentence was imposed as a result of an incorrect application of the sentencing guidelines. (Transcript of Plea held on 4/28/03, Dkt. # 620, at p. 48). The midpoint between 151 and 188 is 169.5 months.

The Court had the government attorney then read Counts 2, 12 and 13 of the Third Superceding Indictment (Id. at 51-53). Judge Gadola had Petitioner under oath acknowledge that he had "read the charges over thoroughly and carefully" and had "discussed those three charges, that is Counts 2, 12, and 13 fully, thoroughly, and completely with Mr. Richardson" his attorney and that he "fully, thoroughly, and completely understand[s] the charges." (Id. At 54-55). After explaining all of his procedural rights at trial, Petitioner plead guilty to Counts 2, 12 and 13 of the Third Superceding Indictment (*Id.* At 55).

Judge Gadola once more had Petitioner under oath acknowledge that he admitted the facts in part 1C of the plea agreement, and specifically again reiterated those facts including the 1987-May 1983 conspiracy to distribute over 15 kilograms of powder cocaine in Count 2, the February 1993 possession of one kilograms of cocaine with the intent to distribute in Count 12, and the March 1993 aiding and abetting in acquiring of approximately one kilogram of cocaine from California in Count 13.

**B.    Factual Background – the Sentencing Hearing**

After the April 28, 2003, plea, the docket sheet shows four adjournments of the sentencing date until February 26, 2004.  These adjournments related to various debriefings and other matters related to Petitioner's cooperation with the government to seek a downward departure recommendation from the Government.  Judge Gadola noted at the beginning of the hearing that Judge Stewart Newblatt had sentenced two other defendants named in the conspiracy – Ollie Robinson and Michelle West – to life imprisonment on Count 3's drug related murder charges after a two month trial.  (Sentencing Transcript, Dkt. #608, p. 4-5.).  At the first Rule 11 Plea hearing on April 25, 2003, Mr. Richardson noted he had only recently been provided the testimony of the government's key witness, Mr. Edward Osborne, in this Robinson trial and others.  (Transcript of Plea held on 4/25/03,  Dkt. # 607, at p. 6).

Prior to Petitioner's sentencing hearing Mr. Richardson made several objections to the pre-sentence investigation report, contesting certain facts to which Petitioner had already stipulated in his plea agreement: (1) denying that Petitioner ever made an agreement with Olee Wonzo Robinson or developed any sources for Robinson from which he acquired cocaine; (2) denying that he held a management role or located and dealt with out of state suppliers for the charged conspiracy, thereby arguing that he should not be given a three-level guideline increase;

7

and (3) denying that the offense level should be 37, arguing that it should instead be 31, yielding

a guideline range of 108 to 135 months.  The government pointed out that "it appears to me that

he wants to withdraw from the plea agreement because he's not abiding to the terms to which he

agreed."  (Sentencing Transcript, Dkt. # 608 , p. 10.).  Mr. Richardson responded:

> MR. RICHARDSON:  If I may, your Honor, I have received a letter from
> the U.S. attorney's office.  I believe I received it yesterday.  I have no problem
> with proceeding under the terms of that agreement.  The U.S. Government was
> today going to make a motion for downward departure and if the Court accepts his
> position, we have no objection.

(*Id.*, p. 11.).  The government stated that it would "stand by" its February 2004 letter and make a

motion for a downward departure.  (*Id.*, p. 12.)  The Court, after a recess during which the

objections were reviewed, stated:

> . . . If there are any objections you want to withdraw, that's fine but they're going
> to be withdrawn not contingent on what I do on a later motion that I'm going to
> hear about a downward departure.

Mr. Richardson withdrew the objections that were subject of stipulations in the Rule 11 Plea

Agreement, with Petitioner's consent on the record.  (*Id.,*  pp. 18-25).  Petitioner's objection in

the Presentence Report that 5 kilograms of drugs were thrown from the car during a police chase

in 1993 was sustained, and that particular drug amount was corrected in the report to reflect the

one or more kilogram stipulated to in the plea agreement.  (*Id.*, pp. 14-17).  It had no effect on the

sentencing guideline range because Petitioner had already pled guilty to responsibility for fifteen

kilograms of cocaine.  Judge Gadola got Petitioner to approve of this modification.  (*Id*.,  p.18).

Judge Gadola also had Petitioner acknowledge that he was satisfied with the modification of the

Presentence Report, and that he realized that "the total amount of cocaine" for which he is held

responsible will remain "as set forth in the Rule 11 Plea Agreement that amount being . . . . 15-50

kilograms of cocaine for which you're responsible in this offense." (*Id.,* p. 21)

Judge Gadola then addressed the objection to the 3 points added for :

> Adjustment for role in the offense. Pursuant to 3B1.1(b) as the Defendant held a management role by locating and dealing with out of state cocaine supplies, a level 3 increase is given in the offense level.

(Presentence Report, p.7 and Sentencing Transcript at p. 21). [1]

After the government read from the factual stipulation related to Petitioner's efforts with Edward Osborne to obtain cocaine from California and from Worksheet A from the Rule 11 Plea Agreement, Mr. Richardson withdrew this objection. (*Id*., at 23). Judge Gadola specifically asked Petitioner whether he understood that and "does that meet with your consent to withdraw that objection. . . ." to which Petitioner responded "yes" to each of these questions. (*Id*., at 23-24). Judge Gadola then specifically asked both Mr. Richardson and then Petitioner whether with the objection to that three level management role withdrawn they also withdrew the objection to the adjusted offense level of 37 to which each responded in the affirmative. (*Id*., at 24).

---

[1] **Sentencing Guidelines §3B1.1. Aggravating Role**
Based on the defendant's role in the offense, increase the offense level as follows:
(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.
**Commentary**
*2. To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.*

9

After the Court formally accepted the Rule 11 Plea Agreement, the government made a motion for a downward departure based on Petitioner's substantial assistance.  Judge Gadola noted in accepting the Government's downward departure of 24 months, he was subtracting those from the bottom of the sentencing range of 151-188 months.  (*Id*., p. 33).  Thus, Petitioner was sentenced below the guideline range to 127 months imprisonment on each count, to be served concurrently.  This was 7 months beyond the 120 month mandatory minimum sentence and Judge Gadola noted it was 3 1/2 and almost 4 years below the midpoint of the guideline range to which Petitioner had agreed to in the Rule 11 Plea Agreement.  (*Ibid.*).  As noted above the midpoint of the guideline range of 151-188 months was 169.5 months.  Thus, a 127 month sentence was 42.5 months below that midpoint on which Petitioner had waived his right to appeal either his conviction or his sentence or the sentencing guidelines application.

In imposing the sentence Judge Gadola noted that Petitioner was a fugitive for nearly ten years, used a false name and was found in Arizona in a room with $291,476 in cash and a small amount of marijuana in a duffle bag inside of a dryer.  (*Id*., p. 31).  He noted this suggested that while a fugitive Petitioner continued to engage in the narcotics business.  Judge Gadola also noted Petitioner evaded arrest on two occasions and questioned whether Petitioner was entitled to the three-level reduction for acceptance of responsibility which was granted.  (*Id*., p. 32).  He noted there also was a question of whether Petitioner during this ten year period was "really involved in obstruction of justice through that string of circumstances."  (*Ibid*.).  Notwithstanding these questions Judge Gadola noted that Petitioner got the downward departure based on the Government's motion.

Judge Gadola told Petitioner he had 10 days from judgment to file any appeal of his conviction if he thought his "guilty pleas in this matter were somehow unlawful or involuntary or

if there's some other fundamental defect of the proceeding not wived by your guilty pleas."
(*Ibid.*, pp. 38-39).  He was also told he could also appeal his sentence if he thought it was contrary
to law.  (*Ibid.*).  Petitioner's judgment was entered March 1, 2004 (Dkt. # 569).  Excluding
weekends under Fed. R. Crim. P. 45(a)(2), his conviction became final on March 15, 2004, the
last day on which he could have filed an appeal.

## II.    STANDARD OF REVIEW

To prevail on a § 2255 motion alleging constitutional error, the petitioner must establish
an error of constitutional magnitude, which had a substantial and injurious effect of influence on
the proceedings.  *Brecht v. Abrahamson*, 507 U.S. 619, 637-638 (1993).  To prevail on a § 2255
motion alleging non-constitutional error, the petitioner must establish a "'fundamental defect
which inherently results in a complete miscarriage of justice,' or, an error so egregious that it
amounts to a violation of due process."  *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir.
1990) (citing *Hill v. United States*, 368 U.S. 424, 428 (1962)).

A petitioner is procedurally barred from raising claims in a § 2255 motion, even those of
constitutional magnitude, to which no contemporaneous objection was made or which were not
presented on direct appeal.  *United States v. Frady*, 456 U.S. 152, 167-68 (1982); *Nagi v. United
States*, 90 F.3d 130, 134 (6th Cir. 1996).  Where a defendant has procedurally defaulted a claim
by failing to raise it on direct review, the claim may be raised in a motion under § 2255 only if the
defendant first demonstrates either cause for the default and actual prejudice, or that he is actually
innocent.  *Bousley v. United States*, 523 U.S. 614, 622 (1998).

The procedural default rule does not apply to claims of ineffective assistance of counsel.
Claims of ineffective assistance of trial counsel generally are not reviewable on direct appeal,

11

because the record may be inadequate to permit review. *See United States v. Kincaide*, 145 F.3d 771, 785 (6th Cir. 1998); *United States v. Tucker*, 90 F.3d 1135, 1143 (6th Cir. 1996). Consequently, such claims may be raised for the first time in a § 2255 proceeding, without regard to a failure to raise them on direct appeal. *See Tucker*, 90 F.3d at 1143; *United States v. Allison*, 59 F.3d 43, 47 (6th Cir. 1995).

In an action to vacate or correct the sentence, a court is required to grant a hearing to determine the issues and make findings of fact and conclusions of law "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255. Yet, the statute "'does not require a full blown evidentiary hearing in every instance . . . . Rather, the hearing conducted by the court, if any, must be tailored to the specific needs of the case, with due regard for the origin and complexity of the issues of fact and the thoroughness of the record on which (or perhaps, against which) the section 2255 motion is made.'" *Smith v. United States*, 348 F.3d 545, 550-51 (6th Cir. 2003) (quoting *United States v. Todaro*, 982 F.2d 1025, 1030 (6th Cir. 1993)). No evidentiary hearing is required if the petitioner's allegations "'cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir.1995)). In sum, where the motion is inadequate on its face or, although facially adequate, is conclusively refuted by the files and records of the case, a hearing is not necessary. 28 U.S.C. § 2255; *Neal v. United States*, No. 94-2416, 1995 WL 325716, at *2 (6th Cir. 1995) (citing *United States v. Carbone*, 880 F.2d 1500, 1502 (1st Cir. 1989)).

On Petitioner's motion, it was determined that a hearing was required on the issue of whether Peititoner's attorney, Mr. Richardson, was ineffective in failing to pursue an appeal after

being instructed to do so by Petitioner, or was he ineffective in failing to adequately consult with Petitioner about filing an appeal. It is determined that the other claims can be resolved without an evidentiary hearing.

## III.   DISCUSSION

### A.   Sentence Enhancements

Petitioner has claimed that his sentence was enhanced improperly based on his pre-sentence report and his alleged leadership role. As noted above, Judge Gadola at the plea specifically obtained Petitioner's acknowledgment as to the truth of the facts in the Rule 11 Plea Agreement including the quantity of drugs for which he was responsible being more than 15 but less than 50 kilograms of cocaine, and that he arranged to acquire drugs from California for the Robinson conspiracy and for distribution in Michigan. He also he read, reviewed with his attorney, and understood his entire Rule 11 Plea agreement which on Worksheet A showed that the criminal offense involved "[a]t least 15 kilograms but less than 50 kilograms of cocaine" and that Petitioner played a "[m]anagement role (locating and dealing with out-of-state cocaine suppliers." (Dkt.# 601, Rule 11 Plea Agreement Worksheet A, p. 1). After a review of Petitioner's objections to the management role increase of three levels at the sentencing, Petitioner stated he understood that he was withdrawing his objections to that three-level enhancement and that he consented to withdrawing that objection. The factual stipulation in the plea agreement shows that Petitioner "exercised management responsibility over the property . . . or activities of a criminal organization" in his flying to California to acquire a kilogram of cocaine that was shipped back to Michigan for the Ollie Robinson drug distribution organization.

13

Thus, Petitioner has no entitlement to relief from that three-level enhancement in this §2255 motion.

Although Petitioner does not state so, it appears that he may also have been making a Sixth Amendment claim under *United States v. Booker*, 543 U.S. 220 (2005). In *Booker*, the Supreme Court held that the Sixth Amendment is violated when a sentencing judge imposes an enhanced sentence[2] under the United States Sentencing Guidelines, based on the judicial determination of a fact (other than a prior conviction) that was not found by the jury or admitted by the defendant. *Booker*, 543 U.S. at 244. The Supreme Court's remedy for the unconstitutionality of the sentencing scheme was to excise the portion of the guidelines that made them mandatory. Thus, prior sentencing by federal judges applying the Guidelines as mandatory could violate *Booker*'s requirement that the Guidelines be counted as advisory, even if the sentence did not exceed the maximum authorized by the facts established by a plea of guilty or a jury verdict.

Yet, the Sixth Circuit and other circuits have held that *Booker* does not apply retroactively to challenges under § 2255 to criminal cases that became final before January 12, 2005, the date *Booker* was issued. *Humphress v. United States*, 398 F.3d 855, 860-863 (6th Cir. 2005); *see also Guzman v. U.S.*, 404 F.3d 139 (2nd Cir. 2005); *Lloyd v. U.S.*, 407 F.3d 608 (3rd Cir. 2005); *U.S. v. Morris*, 429 F.3d 65 (4th Cir. 2005); *United States v. Gentry*, 432 F.3d 600 (5th Cir. 2005); *U.S. v. Cruz*, 423 F.3d 1119 (9th Cir. 2005). As stated above, Petitioner's conviction became final on March 15, 2004, so *Booker* does not apply to Petitioner's Motion to Vacate. To the extent that Petitioner argues that his sentence violated his Sixth Amendment rights under *Booker*,

---

[2] An enhanced sentence is a sentence exceeding the maximum sentence authorized by the facts established in a guilty plea or jury verdict.

14

such claims should be dismissed.

It should be noted that, apart from the fact that the sentencing guidelines were applied as mandatory in his case, Petitioner's sentence was calculated only on the basis of facts he had admitted in his plea agreement. Therefore, even if *Booker* were retroactive, which it is not, there would not have been any error.

Nevertheless, these claims are also involved indirectly in Petitioner's claim of ineffective assistance of counsel which is addressed below.

### B.      Ineffective assistance of counsel

Petitioner states the grounds for his ineffective assistance of counsel as follows:

> That I did not receive effective assistance of counsel at pretrial, sentencing and appellate stages of my case. He never filed my direct appeal like I ask him and never contested the drug amount like I told him.

(Dkt. #593, p. 6.). Petitioner alleges that his counsel was ineffective in two respects: first, that his counsel failed to file an appeal despite Petitioner's request; and, second, that his counsel did not "contest the drug amount" despite Petitioner's request.[3]   In his motion he states that Mr. Richardson kept telling him "they going to give you 30 years so take the plea." (Dkt. # 593, p. 6)

In their response to his motion to vacate, the government attached a declaration by Ralph Richardson, Petitioner's counsel, in which he stated that, "Mr. Wimberly and I agreed there were

---

[3] Petitioner does not specify which drug amount at which stage of his case should have been contested. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (citations omitted). Petitioner has therefore waived this argument by failing to provide any specific facts regarding this claim. Additionally, Petitioner at both his plea and at his sentencing acknowledged that he was responsible for at lease 15 kilograms of powder cocaine. Thus, there was no basis to challenge the amount of 15 to 50 kilograms used in the Presentence Report.

no appealable issues.  Mr. Wimberly also agreed that I would not file a notice of appeal.  As such, one was not filed.  This was done with his full consent."  (Dkt. #603-2.)   Further facts developed at the evidentiary hearing are noted below after noting the legal standards for Petitioner's claim.

### 1.    Standard

The Supreme Court has established a two-prong test for determining whether counsel's performance was ineffective for Sixth Amendment purposes:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction . . .  resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).

In evaluating alleged prejudice resulting from ineffective assistance of counsel, "[i]t is not enough . . . to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693.  Indeed, "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Ibid.* (citation omitted).  Rather, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.

The standard to be applied is not that of a hypothetical perfect counsel, but that of reasonably effective counsel under prevailing professional norms.  *Strickland*, 466 U.S. at 687-88. The fundamental test of effective assistance of counsel is whether counsel "bring[s] to bear such

skill and knowledge as will render the trial a reliable adversarial testing process." *Id*.

When evaluating counsel's performance under the *Strickland* test, the Sixth Circuit has emphasized that "[a] reviewing court must give a highly deferential scrutiny to counsel's performance . . . ." *Ward v. United States*, 995 F.2d 1317, 1321 (6th Cir. 1993). This is based on the well-established principle that legal counsel is presumed competent. *United States v. Osterbrock*, 891 F.2d 1216, 1220 (6th Cir. 1989), *aff'd denial of post-conviction relief*, 972 F.2d 348 (6th Cir. 1992), *cert. denied*, 507 U.S. 917 (1993). As the Court in *Strickland* stressed:

> it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

466 U.S. at 689.

Both prongs of the *Strickland* test apply to claims that defense counsel was ineffective for failure to file a notice of appeal. *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). Yet, the Sixth Circuit has held that the failure to file an appeal in derogation of a defendant's actual request is a *per se* violation of the Sixth Amendment.

> [E]very Court of Appeals . . . has held that a lawyer's failure to appeal a judgment, in disregard of the defendant's request, is ineffective assistance of counsel regardless of whether the appeal would have been successful or not . . . . We agree with those courts and hold that the failure to perfect a direct appeal, in derogation of a defendant's actual request, is a per se violation of the Sixth Amendment.

*Ludwig v. United States*, 162 F.3d 456, 459 (6th Cir. 1998) (citing *Castellanos v. United States*, 26 F.3d 717, 719 (7th Cir. 1994); *United States v. Peak*, 992 F.2d 39, 42 (4th Cir.1993); *United States v. Horodner*, 993 F.2d 191, 195 (9th Cir. 1993); *Bonneau v. United States*, 961 F.2d 17, 23

17

(1st Cir. 1992); *United States v. Davis*, 929 F.2d 554, 557 (10th Cir. 1991); *Williams v. Lockhart*, 849 F.2d 1134, 1137 (8th Cir. 1988). Although the *Ludwig* court did not engage in the two-prong inquiry, after *Flores-Ortega* it is clear that the two-prong *Strickland* test still applies, but that the prejudice prong in such cases is met by the failure to file the appeal as instructed.

By contrast, when a defendant, who did not instruct counsel to file an appeal or not, alleges ineffective assistance of counsel for failure to file a notice of appeal, the court must engage in a more complex inquiry. To determine whether counsel's performance was deficient, the court must first ask: did counsel in fact consult with the defendant about an appeal? *Flores-Ortega*, 528 U.S. at 478. In this context, "consult" has a specific meaning: to "advis[e] the defendant about the advantages and disadvantages of taking an appeal, and mak[e] a reasonable effort to discover the defendant's wishes." *Roe v. Flores-Ortega*, 528 U.S. at 478. If counsel did not consult with the defendant about an appeal, the court must then determine whether the failure to consult constituted deficient performance. If a rational defendant would want to appeal (for example, because there are non-frivolous grounds for appeal), or if this particular defendant reasonably demonstrated to counsel that he was interested in appealing, then counsel's failure to consult with the defendant is deficient performance under the first prong of Strickland. *Roe v. Flores-Ortega*, 528 U.S. at 480.

If a defendant's counsel has performed deficiently by failing to consult with him regarding an appeal, the prejudice prong of *Strickland* is satisfied by demonstrating that there is a reasonable probability that, but for the failure to consult, the defendant would have timely appealed. *Flores-Ortega*, 528 U.S. at 484.

18

## 2.    Evidentiary Hearing

In light of *Ludwig* and *Flores-Ortega*, on May 15, 2007, this Court conducted an evidentiary hearing on the issues of whether Petitioner's counsel consulted with Petitioner regarding an appeal and whether Petitioner asked his attorney to file a notice of appeal.

Respondent argued in its response to Petitioner's motion and at the evidentiary hearing that Petitioner waived his right to appeal, and stipulated to the facts used in the pre-sentence report.  It is true that at the plea hearing, Petitioner consented on the record to the stipulations regarding the facts underlying his offense that were used in the pre-sentence report, and at the sentencing hearing, Petitioner also consented on the record to the withdrawal of his objections to the management role enhancement and to the guideline range of 151-188 months at the sentencing hearing.  Yet, the inquiry at the evidentiary hearing pertained to the question of whether Mr. Richardson, Petitioner's counsel, consulted with Petitioner regarding an appeal, and whether Petitioner asked Mr. Richardson to file a notice of appeal.

Petitioner claims that he instructed Mr. Richardson to file an appeal.  Petitioner testified that he asked his counsel to file an appeal twice: at the courthouse immediately after the sentencing on February 26, 2004, and again during a phone call from a detention facility in Milan, Michigan, in March 2004.  (Dkt. #632, pp. 8-11).  Petitioner said that Mr. Richardson, in that second conversation, said he had not appealed and he would see about getting an extension of time to appeal.  Petitioner said that he told Mr. Richardson that he wanted to appeal on the same grounds on which he objected to the pre-sentence investigation report.  Petitioner indicated that Mr. Richardson responded in the affirmative.  As noted below, Mr. Richardson denied that Petitioner ever asked him to file an appeal on his behalf immediately after the sentencing.

19

Petitioner also testified that he spoke to Mr. Richardson by telephone from a detention facility in Elkton, Ohio, in the fall of 2004, at which time Mr. Richardson said that he was not able to secure an extension of time for the appeal.  Mr. Richardson denied that he ever said that would obtain an extension for the appeal, stating that he knew the time within which to file a notice of appeal simply could not be extended under the court rules.

At the evidentiary hearing, Petitioner submitted a copy of a letter he wrote to Judge Gadola's chambers on October 20, 2004, in which he wrote:

> I was sentenced by you on February 26, 2004 at the time I advised my lawyer Ralph Richardson that I would like to appeal my sentence.  He told me that he was going to appeal to the courts ASAP, then I called Mr. Richardson to discuss my appeal he told me he didn't appeal as I requested him to. . . . I'm asking the court to file notice of appeal on my behalf pursuant to Fed Rule Appellate Procedure Rule 4B.

(Dkt. #624-10).  Petitioner also wrote a letter to Mr. Richardson, which was also introduced at the evidentiary hearing:

> . . .  I need to find out something on how to due [sic] this appeal that I would like to put in with this new laws the Blakely case and everything.  Did you appeal what I ask you to do when I was in Milan right.  I have up to a year to appeal. . . .

Dkt. #624-8.  Petitioner clarified that what he was asking Mr. Richardson to do when he was in Milan was file a direct appeal.  Petitioner also stated that when he wrote that he had a year to appeal, he was in fact referring to a § 2255 motion, because he knew that there were only ten days within which to file a direct appeal.  Mr. Richardson never responded to the letter from Judge Gadola's chambers (which had been forwarded to him) or to the letter that Petitioner sent him regarding the appeal.

At the hearing, Petitioner acknowledged on cross-examination that at his sentencing he stipulated to a management role and enhancement of three levels.  (Dkt. #632, p. 19).   He also

admitted that at sentencing he stipulated to the calculations from the sentencing guidelines and to a base level of 34. ( *Id.,* p. 21). This was based on the 15-50 kilograms of cocaine as noted on Worksheet A. He acknowledged he was challenging his guideline calculations in his current Petition, but refused to agree that you cannot object to something to which you stipulated. (*Id.,* p. 20). When confronted with his plea stipulation to the base offense level of 34 based on drug quantities and his challenge to that in his current § 2255 petition, Petitioner responded: "Correct. But at the same time he [referring to Mr. Richardson] said I can challenge that. So that's why I put that there [referring to his § 2255 petition]. (*Id.,* p. 21-22). He was asked to confirm that at "sentencing it was made clear to you that you had stipulated to the calculations from the sentencing guidelines, is that correct? (*Id.,* p. 23). Petitioner responded "Correct." He was then asked, "So in truth there really was no issue to appeal, was there sir?" Petitioner gave the unconvincing testimony of: "Well, I was told I could appeal from my attorney . . . . challenging the drug amount . . . ." (*Id.*, p. 24). He again acknowledged that he signed a plea agreement. When confronted with the question of whether he signed it "despite the fact you didn't think it was true," he responded: "No. When I signed the plea agreement and we challenged it, he [referring to Mr. Richardson] said I can appeal it, don't worry about it, sign it, we can appeal it. That's what he told me." (*Id.*). He again asserted he signed the plea agreement because of what Mr. Richardson told him, and added, "Because I thought I could challenge it. I wouldn't have signed it if I knew I couldn't appeal it." (*Id.*, p. 25).

It is incredible that an individual such as Petitioner, with two years of college, would believe such at statement if, indeed, it was told to him by his lawyer. It is also not believable that Mr. Richardson, who has practiced law for 37 years (*Id.*, p. 48), would make such a patently unbelievable and incorrect statement to a client. It is found that Petitioner's testimony is false

and motivated by a desire to get his sentence reduced.  It is found that Mr. Richardson did not tell

his client that he could sign a plea agreement stipulating to a drug amount, and a guideline range,

and a three-level management increase, and a waiver of appeal rights if the sentence was below

the midpoint guideline range, but that he could nonetheless appeal those issues later.

   Petitioner was then asked what issue did he discuss with Mr. Richardson about appealing.

   A.  The drug amount and the – the three level increase for that leadership role.

   Q.  You told him that?

   A.  He knew that.

   Q.  No I'm asking you, did you tell him?

   A.  Yes, he knew that. That's why we objected to it.

(*Id.*, p. 25-26).  When asked the time of this, he said "Over the phone when I was in Milan."

(*Ibid.*)  When given some time to think about his testimony he later said he also talked to Mr.

Richardson after the sentence.  (*Id.*, p. 27).  When pressed to confirm that Petitioner told Mr.

Richardson to appeal on the ground of the drug amount and management enhancement, Petitioner

again reverted to his earlier statement, "He knew that."  (*Id.*, p. 28).  When pressed, he claimed he

told him that.  Again, this testimony is found to be not credible.

   This is a case where Petitioner, to avoid higher guideline risks on greater drug quantities,

pled to 15-50 kilograms of cocaine and a three-level management enhancement.  As noted in

detail above, Judge Gadola went over this to assure Petitioner's knowledge, understanding and

consent to this agreement both at his plea hearing and again at his sentencing.  At the sentencing

hearing, Judge Gadola granted the downward departure of 24 months, and petitioner got 127

months, which is 42.5 months below the sentence on which Petitioner waived his right to appeal.

No modestly competent attorney would believe that in this situation his client had a right to

appeal.  No modestly competent attorney would tell a client in such a situation that he had a right to appeal.  If a client asked any modestly competent attorney after such a sentencing that he wanted to appeal, that attorney would explain to the client that because the sentence was 42.5 months below the sentence on which he has agreed to waive an appeal, that he had waived his appeal.  If a client, even if he had not waived his appeal, informed any modestly competent attorney in such a situation that he wanted to appeal the amount of drugs, that attorney would explain to the client that because he had clearly stipulated to the 15-50 kilograms of cocaine both in his plea agreement, again at his plea hearing and again at his sentencing, that such an appeal would be futile.  If a client, even if he had not waived his appeal, informed any modestly competent  attorney in such a situation that he wanted to appeal the three-level guideline enhancement for management, that attorney would explain to the client that because he had clearly stipulated to the facts supporting a management enhancement, and also stipulated to the specific "[m]anagement role (locating and dealing with out-of-state cocaine suppliers" in the Plea Agreement Worksheet A, and specifically waived his objection to that enhancement at his sentencing, that such an appeal would be futile.

Mr. Richardson is a competent attorney, and if Petitioner after his sentencing told Mr. Richardson he wanted to appeal, Mr. Richardson would have discussed the waiver issue and the futility issues with him.  Petitioner made no mention of such responses being made, but suggested Mr. Richardson indicated at the sentencing he would file the appeal, and in the Milan call that he would seek an extension to file the appeal.  Such testimony is not credible.

Mr. Richardson testified that he had practiced criminal law in southeastern Michigan for 37 years.  (*Id.*, p. 48).  He was not an appointed counsel for Petitioner but retained by Petitioner's family.  He acknowledged that he signed several objections to the Presentence Report. (*Id.*, p. 50).

He noted that he reviewed the Rule 11 Plea Agreement with Petitioner and had Petitioner initial certain portions to make sure he understood it.  He noted he was concerned about the potential testimony of Edward Osborne who was going go testify against Petitioner.  (*Id.*, p. 51).  He had reviewed certain taped conversations with Mr. Osborne which he later noted involved Petitioner (*Id.*, p. 55).  He indicated that the downward departure that Petitioner received was not as great as he and his client thought it should be. (*Id.*, p. 52).  He also noted his belief that there would be continued cooperation by Petitioner with the FBI agent with the possibility of further reductions of Petitioner's sentence, and "it was because of that reason that he and I decided that there would be no appeal because he would continue to cooperate and he knew that he – or thought that he would receive special treatment."  (*Id.*, p. 53).  He said that if Petitioner told him he wanted to appeal at the sentence he "would have filed a motion to withdraw his plea."  (*Id.*).  Mr. Richardson also noted that had Petitioner asked about an appeal "we would have discussed fees in terms of appeal."  (*Id.*, p. 54).  He noted that while he was duty-bound to stay with a client through an appeal "I'm not duty bound to do it for free."  (*Id.*).  When asked if he considered asking for court-appointed counsel, Mr. Richardson responded, "I did not because that was never a consideration.  We decided there would be no appeal and he would continue to cooperate whereby he would receive further reduced time."  (*Id.*).  He added that the Court could appoint an attorney to represent Petitioner on appeal, but if he was not going to handle the appeal he would file a motion to withdraw from the case.  While this may sound a touch mercenary, it nonetheless sounds credible that fees would have been discussed or substitution of counsel discussed if Petitioner had sought an appeal.  Petitioner's version of what happened makes no mention of discussing fees with Mr. Richardson or seeking appointed counsel to handle the appeal.

24

Mr. Richardson admitted that Petitioner did not specifically tell him not to appeal but noted "I told him that I didn't think we should appeal because I was fearful of the fact that if he came back for a new trial, he could receive up to life." (*Id.*, pp. 54-55). He again referred to the taped conversations between Mr. Osborne and Petitioner and he explained to Petitioner the disadvantage of taking an appeal. After explaining the risks of the case proceeding to trial he noted that if Petitioner had

> said to me, I don't care, let's take a chance and go for it, but that – you know, and I think that if he had said to me at the sentencing, I want to appeal, that just doesn't make sense because I never would have continued the plea agreement. Why would I take – Why would I allow him to plea if I know that he want to appeal?

(*Id.*, p. 56). He noted the departure for cooperation was not a great as they had hoped and that he never did get any further reduction for further cooperation. Mr. Richardson acknowledged that Petitioner may have thought he did not get the benefit of the bargain for cooperation that he had anticipated, and could understand him saying he wanted to set aside his plea "But he never said that to me." (*Id.*, p. 57).

Mr. Richardson then said that he saw no advantage in appealing first because he did not think it would be successful, and even if it was Petitioner "would be in a worse position that he would have been had he continued to serve his sentence." (*Id.*, p. 58). He said he explained this to Petitioner and after the sentencing Petitioner did not say he wanted to appeal. (*Id.*). He noted it was incorrect that he had no further contact with Petitioner. "I thought we had a very good relationship. He would call me often. As a matter of fact on March 12th he called me and asked me to send him some money, $60.00. I got a money order and I mailed it to him along with the judgment."[4] (*Id.*, p. 59). Mr. Richardson said he was shocked when he received a copy of the

---

[4] As noted above, Petitioner had until March 15 to file an appeal.

letter sent to Judge Gadola.  He said he later got a letter dated July 28, 2004 that opened "[h]ey,

Ralph, what's going on?  I need to find out something on how to do this appeal."  (*Id.*, p. 61).

Petitioner asked about the *Blakely* case which had been decided the month prior[5] and later asked

for his file to be turned over to some agency he had contacted.  (*Id.*, pp. 61-62).

 The first factual issue for this Court under *Flores-Ortega* is to determine if Petitioner

after this sentencing asked Mr. Richardson to appeal his conviction or his sentence.  It is

determined that Petitioner made a knowing and intelligent plea after being advised by counsel,

and after balancing the risks of an increased sentence against the plea target of the midpoint of the

Guideline Range of 151-188 months with the chance for a downward departure for cooperation.

While his potential testimony in Arizona was not needed, and he got a lesser downward departure

than he had hoped for, he did receive a 24-month downward departure to 127 months.  It is clear

he did not have any issues to appeal, first because he waived his appeal for any sentence below

169.5 months, and second the appeal of the base guideline level of 34 for at least 15 kilograms of

cocaine was futile, as was any appeal for the management role three-level enhancement.  While at

sentencing he may have hoped to negotiate a better deal than the one he pled to, when his

questioning of the drug amount or the management role was raised, Petitioner chose to waive

those objections and stick to his plea agreement and the factual stipulations he had made rather

than seek to set the plea aside and face a stiffer sentence if convicted.  Mr. Richardson had read

---

 [5] *Blakely v. Washington*, 542 U.S. 296 (2004), was decided June 24, 2004, and clarified
the holding of *Apprendi v. New Jersey,* 530 U.S. 466 (2000) that under the Sixth Amendment
right to trial by jury "[o]ther than the fact of a prior conviction, any fact that increases the
penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and
proved beyond a reasonable doubt."  *Blakely* clarified that "the relevant "statutory maximum" is
not the maximum sentence a judge may impose after finding additional facts, but the maximum
he may impose *without* any additional findings." *Blakely,* 542 U.S. at 303-04 (emphasis in
original).

the testimony of Edward Osborne who had successfully testified in the trial of Ollie Robinson and others, and Mr. Richardson had reviewed the telephone intercepts of Mr. Osborne and Petitioner, and realized the risks of conviction and the Government successfully attributing to Petitioner a greater amount of drugs that 15-50 kilograms of cocaine.  At the first Plea Hearing on April 25, 2003, the Government attorney indicated one of the advantages of the plea agreement was avoiding the lengthy and complex presentation on the amount of drugs involved in the underlying case.  It is found that Mr. Richardson before and after the sentencing discussed with Petitioner the options including the lack of appealable issues and the risks of a far more severe sentence, and it was agreed not to appeal and hope opportunities for further cooperation may result in further sentence reduction.  Petitioner's version of what Mr. Richardson told him about stipulating to the drug amount and the management role and then appealing it was not credible.  While Plaintiff after hearing about *Blakely* in June and thinking about the likelihood of further sentence reductions for cooperation may have wanted to consider an appeal then, this was not the case on the day of his sentencing.  He did not specifically ask Mr. Richardson to appeal or file a notice of appeal.  Had he done so on the day of sentencing, or even when he talked to Mr. Richardson March 12, 2004 and asked for $60 to be sent to him, Mr. Richardson would have explained the waiver issue and the futility issue and also would have either talked about a further retainer for the appeal or filing a motion for the appointment of counsel.  Had any of these conversations occurred, Petitioner would have recalled them and so testified at the hearing.  He did not mention any such discussions because he never asked Mr. Richardson to take an appeal which would have triggered such a discussion.

Petitioner's October 2004 letter that he wrote to Judge Gadola and the July 2004 letter that he wrote to Mr. Richardson fit into his desire on or after the date the *Blakely* case was decided to

breathe life into a claim for an appeal.  They do not demonstrate prior to that time any specific request to Mr. Richardson to file a notice of appeal.  No such request was made on February 26, 2004 or March 12, 2004.

Once it is determined that a defendant did not directly instruct his counsel to file an appeal the court must engage in a more complex inquiry noted in *Flores-Ortega* to determine whether counsel's performance was deficient in failing to adequately consult with the defendant about an appeal.  In this context, "consult" has a specific meaning: to "advis[e] the defendant about the advantages and disadvantages of taking an appeal, and mak[e] a reasonable effort to discover the defendant's wishes."  *Flores-Ortega*, 528 U.S. at 478.  The Supreme Court enumerated several factors that would be relevant to determining whether or not counsel's performance was deficient for failing to consult with a defendant regarding an appeal:

> Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.

*Flores-Ortega*, 528 U.S. at 480.

Mr. Richardson did consult with Petitioner about the plea agreement, its stipulations and the waiver of appeal if his sentence was below 169.5 months, and the risks of abandoning the plea agreement and its sentencing limitations.  It may be that after the sentence Mr. Richardson did not reiterate these earlier discussions, did not specifically state the amount of drugs and the management role were losing issues on appeal, and did not review the waiver of appeal if the

28

sentence was below 160½ months.  Yet, Judge Gadola at the sentencing just moments before, had highlighted that the 127-month sentence was 3½ and almost 4 years below the sentence Petitioner had agreed to in the plea agreement.

This case also involved a guilty plea and not a trial that might involve a greater likelihood of appealable issues.  Here Petitioner got the sentence he bargained for – indeed he did about 25% better that the sentence he agreed to.[6]  Here the plea specifically waived the appeal.  Thus, these three issues noted as relevant by *Flores-Ortega* work against Petitioner's ineffective assistance of counsel claim.

If counsel did not consult with the defendant about an appeal, *Flores-Ortega* states that the court must then determine whether the failure to consult constituted deficient performance. The first relevant inquiry is whether a rational defendant would want to appeal (for example, because there are non-frivolous grounds for appeal).  In this case, there were no non-frivolous grounds for appeal.  Plaintiff was facing a ten-year mandatory minimum sentence, so even if the guidelines were treated as merely advisory pre-*Booker*, it is unlikely Petitioner would have fared better than 127 months.  There were no grounds to claim that the waiver of appeal was not valid and binding.  Given the plea agreement, the downward departure obtaining a sentence 42.5 months below what was agreed to, the fact of the waiver, the risks of a more severe sentence if the plea was set aside, the possibility of future sentence reduction on further cooperation, it is reasonable for Mr. Richardson to have assumed that he and Petitioner had agreed not to pursue a frivolous appeal or seek to set the plea agreement aside, but rather had agreed to forego any appeal, accept the sentence and hope it might get reduced somewhat upon further cooperation.

---

[6]  127 mos / 169.5   = 74.9 % .

29

While Mr. Richardson might have been more careful after the sentencing in explaining that Petitioner had no appealable issues over the quantity of the drugs and/or the management role unless he wanted to put his plea agreement at risk, had Mr. Richardson been more precise it is not convincing that Petitioner would have abandoned the plea agreement or sought to pursue a futile appeal.  Petitioner knew the risk calculus that led to the plea agreement, Mr. Richardson had reason to know the plea agreement was about as good as could be expected in such a case. Petitioner under oath several times committed himself in open court to the facts stipulated to in the plea agreement  – facts that established an offense level of 34, to which he also specifically agreed, and to a three-level enhancement for a management role.

It appears that after reaching an agreement in April 2003, Petitioner, by February 2004, hoped to better the deal at his sentencing.  When he agreed to back down from that effort and accept the deal he agreed to on April 25 and April 28, 2003, it appears that months later – after the *Blakely* decision in June 2004,  he decided to make another attempt to better the deal, and this effort involved a misrepresentation of what he told Mr. Richardson.  While Mr. Richardson's consultations after the sentencing might have been more extensive and more thoroughly documented, *Strickland* does not require representation by a perfect attorney, but by a reasonably competent attorney.  Mr. Richardson acted in a reasonably competent manner, and under the circumstances he was reasonable in his understanding that he and his client were abandoning any complaints about the quantity of drugs or the management role of Petitioner in arranging for getting a kilogram of cocaine from California to Michigan for the Ollie Robinson drug conspiracy.  Petitioner understood his plea and the facts he agreed to and the sentencing he had agreed to.  He got a significant reduction to the 169.5 months in the plea agreement.  Mr. Richardson was reasonable in his belief that he and his client had agreed not to seek to set aside

30

the plea agreement and not to appeal the conviction or the sentence, but rather to hope further

cooperation might result in a further sentence reduction.

Under *Roe v. Flores-Ortega* a showing of prejudice is not needed if the court finds the

client instructed his attorney to file an appeal.  That showing has not been made here.  If there

was no request by the client for an appeal, then if a defendant's counsel has performed deficiently

by failing to consult with him regarding an appeal, the prejudice prong of *Strickland* still applies.

It is satisfied by demonstrating that there is a reasonable probability that, but for the failure to

consult, the defendant would have timely appealed.  *Flores-Ortega*, 528 U.S. at 484.  It is

determined, that even if Mr. Richardson's performance was deficient, Petitioner would not have

pursued what was a futile appeal both because (i) he had no non-frivolous issues to appeal and (ii)

because he had knowingly waived his right to appeal if his sentence was less than 169.5 months.

## IV.    CONCLUSION

For the reasons stated above, **IT IS RECOMMENDED** that Petitioner's Motion under 28

U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody (Dkt.

#593) **BE DENIED**.  Either party to this action may object to and seek review of this Report and

Recommendation, but must act within ten days of service of a copy hereof as provided for in 28

U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections

constitutes a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th

Cir.1981), *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *Howard v.

Secretary of HHS*, 932 F.2d 505 (6th Cir.1991).  Filing objections which raise some issues but fail

to raise others with specificity will not preserve all objections that party might have to this Report

and Recommendation.  *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th

Cir.1987), *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir.1991).  Pursuant to E.D. Mich. LR *1137

72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

      Note: any objections must be labeled as "Objection # 1," "Objection # 2," etc.; any

objection must recite precisely the provision of this Report and Recommendation to which it

pertains.  Not later than ten days after service an objection, the opposing party must file a concise

response proportionate to the objections in length and complexity.  The response must

specifically address each issue raised in the objections, in the same order and labeled as

"Response to Objection # 1," "Response to Objection # 2," etc.


                                        s/Steven D. Pepe
                                        United States Magistrate Judge

Dated:  March 17, 2009

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or
parties of record by electronic means or U.S. Mail on March 17, 2009.


                                        s/V. Sims
                                        Case Manager